COMPAGNIE FINANCIERE de SUEZ et
de L'UNION PARISIENNE

v.

The UNITED STATES.

No. 411–67.

United States Court of Claims.

Feb. 20, 1974.

D. Nelson Adams, New York City, attorney of record, for plaintiff, Davis Polk & Wardwell, and George A. Bermann, New York City, of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant.

Before LARAMORE and DURFEE, Senior Judges, and NICHOLS, Judge.

## OPINION

LARAMORE, Senior Judge:

Plaintiff brought this suit for $420,-491, plus interest, on two claims for refund which the government denied. The tax in question covers the period 1952

through 1956. Compagnie Financiere de Suez et de L'Union Parisienne [1] (hereinafter referred to as "Suez" or "the Company"), built and operated the Suez Canal until it was nationalized on July 26, 1956.

Suez entered into a trust agreement with J. P. Morgan & Co., Inc., of New York, on January 17, 1949, creating a revocable trust pursuant to which Suez designated J. P. Morgan & Co., Inc. as the trustee of a trust fund for the purpose of enabling Suez to fund or otherwise secure its pension obligations. Current trust income, exclusive of capital gains, was to be paid over to Suez as of December 1 each year. The trustee was also designated as the withholding agent for withholding at the source on interest and dividends in accordance with sections 1441 and 1442 of Title 26, U.S. Code. Suez, at the time the trust was created, and on all the tax returns filed on its behalf, identified itself as an Egyptian corporation. Suez also directly received dividend and interest income upon which withholding at the source tax was also paid at the rate of 30 percent. Plaintiff at no time during the years 1952 through 1956 had a permanent establishment in the United States.

The Company filed refund claims on January 14, 1959 for both the amounts withheld in the trust and investments withheld directly. The basis of the claim was that Suez was a French corporation for the purposes of Article 6A of the Income Tax Convention between the United States and France, signed on July 25, 1939 and October 18, 1946, as modified and supplemented by the Supplementary Convention signed June 22, 1956. Article 6A was a product of the 1956 Convention made retroactive to January 1, 1952, and it reads as follows:

Dividends and interest derived, on or after January 1, 1952, from sources within one of the contracting states by a resident or corporation or other entity of the other state, not having a permanent establishment in the former state, shall be subject to tax by such former state at a rate not in excess of 15 percent of the gross amount of such dividends or interest. Such reduced rate of tax shall not apply to dividends or interest paid prior to the calendar year in which are exchanged the instruments of ratification of the present Convention if, for the taxable year in which such dividends or interest is received, penalty for fraud with respect to the taxes which are the subject of the present Convention has been imposed against the recipient of such dividends or interest.

The government disallowed the claims because it considered the Company to be Egyptian for the period 1952 through 1956 and, therefore, not eligible for the preferential 15 percent withholding rate under Article 6A of the Income Tax Convention between the United States and France.

The necessary facts are stated in the court's opinion based on the stipulation of facts agreed upon by the parties. There is no issue of fact in this case.

One must delve into the Company's history to appreciate the litigants' arguments. The Company's promoter and founder, a Frenchman named Ferdinand de Lesseps, was granted the First Concession by the Turkish Viceroy of Egypt on November 30, 1854. This first order recognized de Lesseps' revolutionary idea of cutting a canal through the Isthmus of Suez. It granted de Lesseps the authority to establish a company to construct and operate the canal. The Act provided in general terms that the manager of the company was to be appointed by the Egyptian Government and that its articles of incorporation and any amendments thereto were to be approved by the Viceroy. On January 5, 1856, the Second Concessionary Act was issued to provide more detailed information and documentation. It enumerated the details of construction and operation of the

1. The name stated is that of the successor to the original company, "Compagnie Universelle du Canal Maritime de Suez."

canal under a 99-year concession and had the articles of incorporation appended to it. Significant provisions of the act bearing on the Company's origin included the Viceroy's appointment of de Lesseps as the chief executive officer of the Company for a period of 10 years,[2] approval of the appended articles of incorporation [3] and other indications of bestowing sovereign grace upon the corporation to be, such as limiting the length of its existence.[4]

Subject to the foregoing, the articles of incorporation established every feature of the Company as a corporate entity. Article 1 declared the corporation to be formed and named it the Universal Company of the Suez Maritime Canal. Article 2 announced the corporate purpose to be the construction and operation of the Suez Canal. Article 3 declared that the Company's head office would be at Alexandria and its administrative domicile in Paris. Article 4 set the commencement as of the date a notarial sworn affidavit is signed, showing that all shares have been subscribed to. Other provisions dealt with the capital structure, issuance, registration, record ownership, stock transfers, directors and officers, their number, election, duties and powers, an executive committee, stockholders' meetings and dissolution. Two provisions refer directly to the sovereign authority of the Egyptian Government in creating this corporation and in granting special administrative and jurisdictional privileges based on its international character. They are:

### Article 71

If practical experience points to the usefulness of making amendments for additions to these articles of incorporation, the general meeting shall provide such amendments, in the form determined in article fifty-seven.

The resolution of the meeting in this respect however can be executed only after the approval of the Egyptian Government.

All powers are given in advance to the board of directors, when deliberating on the basis of a two-thirds majority of the votes of members present, during a special meeting held for this purpose, so as to make possible the changes which the Egyptian Government may consider necessary in the amendments voted by the general meeting.

and

### Article 73

Since the company is established, with the approval of the Egyptian Government, as a corporation, similar to the corporations authorized by the French Government, it is governed by the principles applicable to these latter companies.

Although the company head office is at Alexandria, the company picks as

---

2. "*Article 20*
"Regardless of the time necessary for the execution of the work, our friend and authorized agent, Mr. Ferdinand de Lesseps shall preside over and direct the company as the first founder for a period of ten years starting on the day of commencement of the period of utilization of the concession, which is ninety-nine years, under the provisions of article sixteen, above."

3. "*Article 21*
"The attached articles of incorporation of the company, created under the name of: Universal Company of the Suez Maritime Canal, are hereby approved, and this approval serves as authorization for constitution, in the form of corporations, as of the date the Company shall be entirely subscribed to."

4. "*Article 16*
"The duration of the company is fixed at ninety-nine years, as of the completion of the work and of the opening of the maritime canal for ocean-going navigation.
"At the expiration of this period of time, the Egyptian Government shall regain possession of the maritime canal built by the company, under its responsibility, [and shall] in this case take over all of the equipment and supplies used for the maritime operation of the enterprise and shall pay to the company the value as it may be fixed either upon friendly agreement or upon the statement of experts."

\*       \*       \*       \*       \*

its legal domicile and for purposes of jurisdiction, its administrative domicile in Paris, where all writs must be served upon it.

Article 76 then provided for a special commissioner of the Egyptian Government to remain in permanent residence at the administrative domicile of the Company in Paris. The articles of incorporation closed with the following:

We, Mohammed Said Pasha, Vice-Roy of Egypt.

After having taken cognizance of the draft of the articles of incorporation of the Universal Company of the Suez Maritime Canal and connected facilities, which was submitted to us by Mr. Ferdinand de Lesseps, whose original, containing seventy-eight articles, remains filed in our archives.

Hereby declare that we give these articles of incorporation our approval, so that they may be annexed to our firman concerning the concession and the articles and conditions, as of this day.

Done at Alexandria, on five January eighteen hundred and fifty-six.

O Seal of His Highness
the Vice-Roy.

The capital stock was subsequently subscribed to on an international basis with French investors and the Egyptian Government absorbing the majority.

In accordance with Article 4 of the Articles of Incorporation, on December 2, 1858, de Lesseps, as founding president of the Company, filed with a notary public, Maitre Mocquard, a sworn affidavit, appending certified translations of the Turkish originals of the First and Second Concessionary Acts, the Articles of Incorporation, a decree relative to the employment of Egyptian workers, all duly stamped and "legalized in Paris by the Counsellor of the Consulate-General of Turkey and by the office chiefs of the Chancellery of the Ministry of Foreign Affairs." This was followed by a second affidavit of December 15, 1858, filing with Maitre Mocquard a list of the subscribers to all of the capital stock of the

company and de Lesseps' designation of the board of directors and of the executive committee of the company.

Following these measures the corporation's executive committee was uncertain regarding its legal status in France as is evidenced by the following records:

M. St. Elme advised that the secretary-general of the bank has asked before opening an account for the Company, that the documents relating to its constitution and especially the Articles of Incorporation be submitted to him.

A member stated that before submitting the Articles of Incorporation for examination, it would be good to determine certain questions, especially the situation of the Company in France, from a legal point of view. The Suez Canal Company is a foreign corporation which is not in any way subject to the formalities to which French corporations are subjected since its seat is in Alexandria. But the provision of the Articles of Incorporation which establish in Paris the legal domicile and attributes of jurisdiction, are they not of a nature which alters this situation and do they not expose the Company to the necessity of obtaining the authorization of the French Government and of complying with certain formalities such as, for example, the publication of the corporate deed. That is a question to be examined. This committee shares this opinion. It was decided that the legal advisory committee would be convoked the next December 24 and that its advice would be sought and that its advice be acted upon.

The legal advisory committee of the Company reported that the French Emperor, Napoleon III, had issued a decree on May 7, 1857, which permitted foreign corporations that had submitted to the authorization of the Belgian Government, to exercise their rights in France. Article 2 thereof also provided that "[a]n imperial decree, rendered in council of state, may apply the benefits of article 1 to all other countries." The Company

lawyers recommended that a similar decree should be sought for the benefit of the Company authorizing Egyptian corporations to do business in France.

The corporation then solicited an imperial decree from Napoleon III to enable it to exercise its rights in France. In the course of the solicitation the Company enumerated the previously stated facts concerning its creation and held itself out as an Egyptian corporation seeking to do business in France. The decree authorizing Egyptian corporations to do business in France was issued on May 7, 1859. It closed with the following provisions:

Have hereby decreed and do decree the following:

Article 1. Corporations and other commercial, industrial, or financial associations which, in Turkey and Egypt, are subject to the authorization of the government and which have obtained it, may exercise all of their rights and may sue in civil actions in France, complying with the laws of the Empire.

Article 2. Our minister-secretary of state in the department of agriculture, commerce, and public works is charged with the execution of this decree which shall be published in the *Bulletin des Lois* and shall be printed in the Moniteur.

Done in the Palace of the Tuileries, on 7 May 1859.

Napoleon.

By the Emperor:

The minister-secretary of state in the department of agriculture, commerce and public works.

Signed: E. Rouher.

The Executive Committee, still uneasy about its nationality and overall legal status, decided to address a series of questions regarding the problem to its own Legal Advisory Board and independent members of the French Bar. On the major question in issue both groups came to a similar result which is stated best in the Company's Legal Advisory Board conclusion as follows:

IN THE FORM, this is an Egyptian commercial corporation thereby subjected to the conditions of natural law only and to the high supervision of the Viceroy. In this dual connection, it is beyond any reproach, and as to the situation it has in France, it is very clearly defined by the Imperial Decree of May 7, 1859, mentioned in the advisory memorandum, and which is all the more applicable to it since it has obviously been issued for it.

The Sultan's final approval of the canal concession was embodied in a decree of March 19, 1866. The decree's two provisions, one establishing nationality and jurisdiction for various judicial purposes and the other reaffirming all preceding agreements, relevant to the matter in dispute are as follows:

*Article 16*

Since the Universal Company of the Suez Maritime Canal is Egyptian, it is governed by the laws and customs of the country; however, as regards its constitution as a company and the relationships of the associates among each other, it is, by special convention, governed by the laws which apply in France with respect to corporations. It is agreed that all disputes arising under this heading shall be judged in France by arbitrators with appeal, with arbitrator at the Imperial Court of Paris.

Differences, in Egypt, between the company and private individuals of whatever nationality, shall be judged by the local courts according to the manner spelled out by the laws and customs of the country and the treaties.

Disputes which might arise between the Egyptian Government and the company shall likewise be subjected to the local courts and shall be resolved according to the laws of the country.

The supervisors, workers, and other persons belonging to the company administration shall be judged by the local courts according to local laws and

treaties for all crimes and disputes in which one of the parties is indigenous.

If all parties are foreign, they shall proceed among themselves in accordance with the established rules.

Any serving of writs upon the company, by any interested party in Egypt, shall be validly done at the administrative headquarters in Alexandria.

*Article 17*

All prior acts, concessions, conventions, or articles of incorporation are maintained in all of their provisions that do not conflict with this convention.

Preliminary construction work had begun prior to the Sultan's final approval. After March 19, 1866, the work proceeded rapidly to completion and the Suez Canal was opened to navigation on November 17, 1869. See Hallberg, The Suez Canal (1931), c. XIII, pp. 212–214. The Suez Canal was operated by the Suez Canal Company from that date until July 26, 1956, when the Egyptian Government nationalized the Canal.[5]

During the corporation's operating history, all major administrative functions (*i. e.*, executive, administrative, treasury, accounting offices and all meetings of the shareholders, directors, and executive committee) were performed through its general administrative office in Paris. All the Company's officers and all the Company's resident agents in Egypt, with one exception, have been French citizens. The Company's securities were registered on the French Stock Exchange among those issued by French companies. For purposes of handling its securities the Company was subject to French jurisdiction while for tax purposes the securities were treated as foreign. The Company entered into agreements with the French Bureau of Income Taxation to provide for withholding at the source of the tax on its securities registered on the French Stock Exchange.

The Company held itself out to investors as an Egyptian corporation. The 1932 brochure of the Company describing its securities to investors, which remained in circulation until 1953, stated the following:

The Suez Canal Company is an Egyptian stock corporation authorized by Acts of the Egyptian Government of November 30, 1854 and January 5, 1856, confirmed by the firman of the Sultan of March 19, 1866. Under the terms of Article 73 of its Statutes, "the Company, having been formed with the approval of the Egyptian Government as a limited liability Company, by analogy with limited liability companies (*Societes anonymes*) authorized by the French Government, is governed by the principles that apply to the latter companies" (Commercial Code, Articles 29 et seq.).

Its head office is in Egypt and its administrative domicile is at 1 Rue d'Astorg, Paris VIII.

The Company's relations with the Egyptian Government were often regulated by special agreements (or conventions) between the Egyptian Government and the Suez Canal Company rather than by the laws of general application to Egyptian corporations. In the course of negotiating one such special agreement of March 7, 1949, the Company's president, M. Charles Roux, made the following representation to the Egyptian Government:

The Company has never disputed being an Egyptian company. And it is most certainly not doing so now, any more than it ever has. The only inference it has drawn from being "universal" has been that it is deserving of special agreements with the Government, which the Egyptian Government, for its part, has never refused to enter into with it.

\* \* \* \* \* \*

The Universal Company of the Suez Maritime Canal is an Egyptian company, but quite an exceptional one, warranting special agreements.

5. Whiteman, Digest of International Law, vol. 3, p. 1097 (1964).

The above statement in substance was repeated in the 1949 Annual Report of the president of the Company.

On April 12, 1955, the Company filed a French tax return for the year 1955 with the Department of the Seine, Paris, in which it described itself as an Egyptian civil corporation. In this return, referring to a statement made in 1951, the Company claimed exemption from any French income or turnover tax because it did not conduct any business in France.

On July 26, 1956, the Egyptian Government promulgated a law for the nationlization of the Company and all its properties. This action created an international crisis.

In November, 1956, French, in concert with England, sent a military force into Egypt to occupy the Canal Zone. Anglo-French troops were landed at Port Said under cover of a naval and aerial bombardment and the Egyptian garrison surrendered. Port Fuad was also seized by the Anglo-French forces. In response to international pressures, a cease-fire was called and the Anglo-French forces were withdrawn from Egypt in December, 1956.

The Egyptian Government brought a test suit in the Swiss Court at Basel, Switzerland, to recover the Company assets in that country. The French National Assembly, in support of French stockholders and management of the Company, enacted a law declaring that the Company survived the nationalization of its Egyptian properties, as a corporation governed by French law.[6]

At the stockholders' meeting of June 25, 1957, the directors, faced with the impending dissolution of the Company upon the loss of the Canal concession, proposed (in accordance with Article 72)[7] the reconstitution of a new company, not subject to the authority of the Egyptian Government, and, unlike its predecessor, with registration as a French corporation, with its head office in France. This was subsequently accomplished.

In its French tax return for 1956, filed March 25, 1957, the Company described itself as a civil corporation operating a canal in Egypt.

On November 15, 1957, the Tax Department of the Seine advised the Company that it was constituted in the form of a French corporation, and because its business had been carried on outside France, it was not subject to tax on the income from investments in other countries, closely related to its Egyptian activity. The Company has paid no French income tax for 1956 and prior years.

The convention and protocol of which Article 6A is a part does not provide the guidance necessary for settling this issue. It neither provides counsel for determining a corporation's domicile or origin for the purpose of applying the treaty, nor does it provide a guide for determining where the corporation was created or organized. Article III of the Protocol, signed July 25, 1939, does not define a French corporation. Article III(e) states:

The term "French enterprise" is defined in the same manner, *mutatis*

---

6. The French National Assembly enacted Law No. 57–658 of June 1, 1957, J.O. 5571 [1957], relating to the legal status of the Suez Canal Company and providing:
"The Çompagnie Universelle du Canal Maritime de Suez, governed, as regards its establishment as a corporation and the relations of its shareholders with each other, by the provisions of French law, remains subject to said provisions and to its Articles and By-Laws, in particular in all matters which concern its corporate existence, its corporate bodies and its corporate assets, without being able to be affected by the provisions of any foreign law.

"Provisions of the Company's Articles and By-Laws which subject to the approval of the Egyptian government the implementation of resolutions of the General Shareholders' Meeting passed with the purpose of effecting amendments of or additions to said Articles and By-Laws are hereby declared null and void and shall be considered as invalid and cancelled."

7. "*Article 72.* In case of dissolution of the company, the general meeting shall upon proposal of the board of directors, determine the manner to be adopted either for liquidation or for the reconstitution of a new company."

*mutandis*, as the term "United States enterprise."

Article III(d) states:

The term "United States enterprise" means an enterprise carried on in the United States of America by a resident of the United States of America or by a United States corporation or other entity.

Treasury Regulation, section 514.104 (3)[8] states:

The term "French enterprise" means an enterprise carried on in France by a nonresident alien individual resident of France or by a French corporation or other French entity. The term "corporation or other entity" means a partnership, corporation, or other entity created or organized in France or under the laws of France. For example, an enterprise carried on wholly outside France by a French corporation is not a French enterprise within the meaning of the convention. Whether a French entity is a corporation * * * is to be determined in accordance with principles of existing law relating to the taxation of nonresident aliens and foreign corporations.

The corporate characteristics are set forth in Treasury Regulations on Procedure and Administration (1954 Code) (26 C.F.R.), section 301.7701–2(a)(1) as:

(i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests.

The Suez Canal Company was undoubtedly such a corporation.

The remaining question is whether the Company was a "French" corporation for the purpose of Article 6A. The plaintiff contends that based on the facts the cor-

poration, from its inception, was created and organized in France to qualify it for the treaty benefits of Article 6A. In addition, the plaintiff asserts it is a French corporation according to the French rule for determining domicile based on the location of its administrative head office in Paris.

As per the stipulation, both parties acknowledged that steps were never taken to either qualify the Company as an Egyptian corporation under Articles 28, 32 and 34 of the Code of Commerce of the Ottoman Empire or to comply with the requirements of the French Code of Commerce for the organization of commercial corporations. The Company considered these provisions inapplicable to it. The record indicates that at all times the Company was accorded a unique status.

A distinction must be made between being deemed to be a French corporation for a particular purpose primarily of interest to France and being a French corporation in fact from the Company's inception or due to the nature of its creation. The latter question, which sovereign power clearly exercised its authority to recognize the Company as a corporation, from its inception, is a question only of interest to the United States, and it is answerable on a factual determination.

"Unlike an individual, a corporation has a state of incorporation."[9] In the important aspect that sovereign power is indicative of granting the authority for the corporation's existence, that recognition was Egyptian. The First Concessionary Act evidenced Egypt's sovereign permission to form a company for the designated purpose of building and operating a canal. The Second Concessionary Act demonstrated Egypt's grant of sovereign authority for the Company's creation by providing for its duration and

8. Treas.Reg. § 514.104 (1954) was formerly numbered section 7.413. The Regulation was renumbered on January 1, 1961, at 25 Fed. Reg. 14021.

9. Restatement (Second) of Conflicts of Laws, section 11(1), (as adopted and promulgated by the American Law Institute, May 23, 1969.)

termination.[10]    Egypt again demonstrated its sovereign power over the Company by taking the liberty to appoint its first Chief Executive Officer, Mr. Ferdinand de Lesseps, for a period of 10 years.[11]  The Viceroy representing the Egyptian Government was the only sovereign [12] to approve the articles of incorporation.   The approval of the articles of incorporation gave the Company the legal right to constitute itself and conduct business in the form of a corporation upon the date to which its stock was entirely subscribed.[13]

The officially sanctioned articles contained the essentials for establishing a corporation.   It also contained further indicia of Egypt's sovereign power to affect the Company's legal relations.  Article 71 clearly indicates Egyptian nationality of the Company by reserving to Egypt the final power for making amendments or additions to the corporate articles operative.   Nowhere in the well-documented history of this Company is there a broad sovereign power of this kind reserved to the French government.  Article 73 demonstrates Egypt's domi-

nant sovereign power over the Company, because while it unequivocally establishes the corporation's nationality as Egyptian it permits the Company the privilege of following French law regarding shareholders' interests *inter se*.  This concession to French law cannot be construed as tantamount to making the Company French for every legal purpose when, in fact, French sovereignty was not responsible for granting the initial authority for the corporation's existence.

Article 73 also established the Company's head office in Alexandria, Egypt,[14] but recognized Paris as the administrative and legal domicile for the purpose of jurisdiction.   There is much dispute whether either site is clearly indicative of the Company's domicile for the purpose of determining nationality.

One of the plaintiff's major points, supported by a recitation of facts concerning the administrative functions, was that the Company's real domicile (siége social reél) was its administrative office in Paris, and under French law that is sufficient to give it French nationality for all purposes.[15]   The countervailing

---

10. *Id.*   Conflicts of Laws 2d., § 299(1) "Whether the existence of a corporation has been terminated or suspended is determined by the local law of the state of incorporation."

11. *Supra,* n. 2.

12. The Viceroy of Egypt was ultimately subject to the political control and sovereignty of the Ottoman Sultan.

13. *Supra,* n. 3.

14. The designated head office was eventually moved, with the approval of the Egyptian Government, to Cairo.

15. "The criterion which has been unanimously accepted by the French Courts for the determination of the nationality of corporations, and which is considered at present, with the exception of the decisions based on wartime legislation. as the decisive one, is that of the domicile of the corporation.   It is important here to define what is meant by 'domicile' of a corporation.   The domicile of a corporation, under Article 1002 of the Civil Code, is considered to be located at its principal place of business.   The principal place of business is not necessarily located where it is designated by the Act of Incorporation.   This designation may be fictitious.   A corporation is held to

have the nationality of the place where its Head Office or principal place of business is really situated.   Where this principal place of business actually is, becomes a question of fact to be gathered from the circumstances of the case, and in which are to be taken into consideration, as elements of proof, the designation in the Act of Incorporation and By-laws of the corporation, of such place where the general management of the corporation is situated, where the General Meetings of Stockholders are held, where the books are kept, the inventories made, where the main organism of the corporation is operated, or, in other words, the place from which the operations of the corporation are directed." C. Loeb, Legal Status of American Corporations in France, Lecram Press (1921), Paris, pp. 30–31.

\*      \*      \*      \*      \*

"A company has the nationality of the country where it has its legal domicile (siége social), whether or not its principal place of business is located there.   The domicile, of course, cannot be a mere front; thus a company cannot have its offices and accounting departments in France and hold its directors' and stockholders' meetings there, while escaping the requirements of French law by

fact is that the Company had its designated head office (siége social) in Egypt, its primary place of business and its basic source of income.

The literature does not support the plaintiff's unequivocal contention.[16] The French interpretation of domicile for purpose of determining nationality depends upon the interests involved.[17] The ultimate policy determination appears to rest on whether the French Court is being called upon to protect the interests of creditors [18] and shareholders who are predominantly French. In pursuing this policy, the head-office test is a useful general rule but is not rigorously applied, particularly where it would lead to an undesirable result for French interests.[19] There are no general French statutory provisions defining "nationality" in the case of corporations.[20]

The plaintiff attempts to write the Egyptian designated head office (siége social) into a fictitious and nominal position incongruent with the facts. The acknowledging sovereignty of Egypt obviously required the head office designation as a condition for recognition and existence. The Egyptian head office was far from nominal in character because at a minimum it was responsible for the daily operation of the Canal. The designated head office (siége social) was located in the territory where the enterprise carried on its primary profit-making functions. Egypt required the Company's management to keep a minimum of one representative at this "designated" head office at all times. It should also be repeated here that the French case law does not put unequivocal weight on the location of an administrative head office when it may be adverse to the French interest at stake. Based on these considerations we do not find the plaintiff's argument persuasive.

The plaintiff also misinterprets the Notarial Acts of December 12, 1858 and December 15, 1858 as incorporating the Company in France. Neither of the two French Notarial Acts bestowed a major right or privilege on the Company that would be indicative of the sovereign power to approve or ratify the corporation's existence. In the chronology of events these acts involved nothing more than de Lesseps' execution of Article 4 of the Articles of Incorporation, which provided:

> The existence of the Company shall date from the day of the execution of the corporation deed showing the sub-

---

claiming to have its domicile in a foreign country. The courts may freely judge whether or not the declared domicile can, in fact, qualify as the legal domicile." E. Church, Business Associations under French Law, Fallon Law Book Co. (1960), § 439.

16. Note, 74 Harv.L.Rev. 1429 (1961), The "Nationality" of International Corporations Under Civil Law and Treaty.

17. The two following cases are illustrative of this point: Bouvet v. Societe Anonyme Francaise des Mines de fer, cour d'appel e'Angers, June 23, 1913, 2 Gazette du Palais 113. The corporate charter specified London, England as the head office where the directors met. Industrial operations were at the place of incorporation entirely within France; the majority of shareholders and directors were French. Based on significant contacts the court said the corporation was French, declared it a nullity because it failed to incorporate in France, thus allowing the French investors and creditors to pursue the personal liability of the directors and promoters. So-

ciete W. Canadian Collieries v. Vanberts, Tribunal civil de Lille, May 21, 1908, [1910] D. II 41. Company incorporated in London, England, where it held its shareholders' meetings, operated mines in Canada, maintained central administrative offices in France where its directors (French majority) met and from which the corporate business activities were conducted. The court held London was a reasonable place for a designated head office, giving judicial recognition to the claimed English "nationality" and thus thwarted a shareholder action to have the corporation nullified.

18. Cousin-Devos v. Societe Auxiliaire de Transports, Tribunal de Commerce de Perpignan, December 23, 1913, 64 J.Trib.Comm. 672 (1915), 44 Clunet 1066 (1917). The court acknowledged and then ignored the corporation's foreign nationality in order to protect creditors.

19. *Supra,* n. 16.

20. *Supra,* n. 16.

scription of all of the shares. Its duration shall be equal to the duration of the concession.

■ The plaintiff, with its expert, claims French law of the period required only that contractual expression of intention by the incorporators and subscription to all of the Company's shares was needed to form a corporation. These elements were encompassed by the Notarial Acts. The weakness of this contention is that it runs contrary to the record. Plaintiff's expert failed to consider the Imperial Decree of May 7, 1859, which recognized the Company for the purpose of exercising its rights in France, but it certainly did not recognize or approve the corporation's creation.[21] The plaintiff's contention also ignores the opinion of its own Legal Advisory Board and that of the independent members of the French Bar. The defendant's expert also points out that the plaintiff's expert based a portion of his interpretation on an erroneous statement of law.[22] The court also notes that the plaintiff's legal expert equates the Company's having its administrative organization in Paris with being created or organized in France. Having one's corporate administrative offices in a given place is very different from being created or organized in that place. The latter involves the sovereign's scrutiny and eventual approval of the rules by which the corporation will function. A plain reading of the facts say this was not done by France.

On occasions when the Company had doubts about its nationality, subsequent to the Notarial Acts, it was resolved both by the Company,[23] and by outsiders,[24] to be an Egyptian corporation.

21. "A large number of governmental decrees and bilateral international treaties have granted to companies legally formed in their own country authorisation to do business in France. Such companies remain subject to the legislation of their own country in matters of their formation, their conduct and their dissolution. Their by-laws are valid, so long as they do not violate any rule of public policy (regle d'ordre public).

\*       \*       \*       \*       \*

"Although, in general, foreign companies are subject to foreign legislation, certain matters are regulated by French law; this is usually the case where the interests of third parties require protection." E. Church, Business Associations Under French Law, Fallon Law Book Co. (1960), § 439.

22. Plaintiff's expert stated that the Suez Canal Company was a civil company organized under the provisions of Article 1832. The reference refers to a partnership, *supra* n. 21, at section 97, which states as follows:
"§ 97. *Civil companies in general*
"There are three forms of companies which are governed entirely by the civil law, two of which, the universal property partnership (societe universelle de tous biens presents) and the universal profit partnership (societe universelle de gains), are of antiquarian interest only, and need not be examined here. The third, and still extant, form of civil company is the civil partnership (societe particuliere), which will be discussed in this part. A civil partnership is loosely defined by the Civil Code as a company concerned only with the ownership, use or exploitation of a specific property; but it may also be a company formed for the conduct of a particular enterprise, or for the exercise of a particular trade or profession. Either of these definitions could perfectly well apply to certain commercial companies; it is more precise to define a civil partnership as a partnership conducting activities which are civil rather than commercial in nature."
As a contrast, a company is defined, in section 45, as
" \*  \*  \* a relationship by contract whereby two or more persons agree to pool assets for the purpose of sharing the resulting profits."

23. In soliciting the Imperial Decree, de Lesseps letter of December 26, 1858, stated the Company was already established in Egypt with its head office in Alexandria. *See also*, Delson, The Nationalization of the Suez Canal Company, 57 Colum.L.Rev. 755, 782 (1957).

24. The Company's Legal Advisory Board and the independent members of the Bar found the Company to be Egyptian. See quote on page 802, *supra*. A number of authorities and articles have also found the Company to be created or organized as an Egyptian corporation. *See*, Huang, Some International and Legal Aspects of the Suez Canal (51 Amer. Journal of International Law (1957), pp. 277, 286–289). Notes: Nationalization of the Suez Canal Co., 70 Harv.L.Rev. 480, at 487, n. 54. N.Y. Times, October 6, 1956, p. 3, col. 1, statement by British Foreign Secretary Lloyd did not consider the Company to be French. N.Y. Times, October 6, 1956,

From the time the Company began soliciting the Imperial Decree of May 7, 1859 through the tax years in question, it held itself out as an Egyptian corporation [25] and derived benefits in the nature of special conventions by so doing.

The Sultan's final approval reaffirms the fact that the Company was incorporated in Egypt with jurisdictional rules for settling disputes compatible with what the parties considered their special international situation. It is also interesting to note that concerning at least one issue involving an internal dispute regarding the form in which dividends would be paid, the Company submitted itself to the jurisdiction of the Egyptian Mixed Courts.[26]

The Articles of Incorporation is the contract between the State and the Company, between the Company and the shareholders and between the shareholders among themselves. The facts show that France did not grant or exercise the sovereign powers by which the Suez Canal Company functioned under this contract. The Company recognized the sovereign grace that gave it life by consistently holding itself out as an Egyptian corporation. France, at the most, acquiesced in the Company's granted powers by allowing the Company to administer its business from within French territory. The facts do not show that France, through its sovereign authority, plainly granted the Company the powers under which it functioned. Without further belaboring the point the Company was, in fact, created or organized in Egypt and is, therefore, an Egyptian corporation for the purpose in issue.

Complementing the above finding based on the facts, Treasury Regulation, section 514.104(3), *supra*, also precludes the Company from availing itself of Article 6A of the Convention. The Regulation stated in part, as an illustration:

> \* \* \* an enterprise carried on wholly outside France by a French corporation is not a French enterprise within the meaning of the convention.

The basic nature and purpose of the enterprise in question was to operate an international waterway [27] through Egyptian territory for profit. Egypt was the primary source of the corporation's

---

p. 3, col. 5, statement by French Foreign Minister Pineau also did not consider the Company as French. During the years in issue, French tax authorities considered the Company to be Egyptian.

25. The Company's stock was taxed as a foreign security. Additional evidence that the Company considered itself foreign was that it entered into agreements with the French Bureau of Income Taxation to provide for withholding of the tax on its securities registered on the French Stock Exchange. Also refer to quotes on page 803, *supra*, concerning the 1932 Company brochure describing its securities, and page 803, *supra*, regarding comments made in 1949 to both the Egyptian Government and to the general public through the corporation's annual report. Also the 1955 Corporate Tax Return stated that it was an Egyptian corporation not engaged in any business in France and, therefore, considered itself not subject to French income tax. The Company also consistently stated to J. P. Morgan & Co., Inc. and the U. S. Treasury that it was an Egyptian corporation.

26. The leading case is J. Shallam & Sons v. Compagnie Universelle de Canal Maritime Suez, 23 Gazette des Tribunaux Mixtes (1932–33), p. 304; Annual Digest and Reports of Public International Law Cases (1931–32) case #137, p. 268 (June 8, 1931). The issue involved whether Egyptian statutes regulating payment in gold on securities of Egyptian corporations were applicable to dividends on the capital stock and debenture interest of the Company. The case held "that although the administrative headquarters of the Company was in Paris, its siége social was in Egypt. Accordingly, the Company had a double status, and was governed, in regard to its corporate activity, by the laws of Egypt, but, in regard to the relations of its members *inter se*, by the laws of France. The dividends must be paid in gold francs as stabilized by Egyptian law."

27. From its inception, various proposals were made at international meetings concerning the international character of the Canal. These culminated in the Convention signed at Constantinople in 1888 which declared free passage for all nations. See Whiteman, Digest of International Law, vol. 3, ch. VIII, Inter-Oceanic Canals, Suez Canal, at p. 1076 (1964). The issues of public international law are not relevant to this case.

income. The administrative functions conducted in Paris were merely an adjunct to the basic profit-making enterprise carried on in Egypt, wholly outside France. The purpose of the Regulation example is interpreted as identifying and closing a potential "loophole". It was intended to prevent corporations that were incorporated in France and conducted all their profit-making business outside of France, so as to be free of French taxation, from claiming tax benefits of treaties to which France was a signatory. The point is that during the years 1952 through 1956 France continued to assess tax on the jurisdictional basis of the income source. Only income from what was considered domestic sources was taxed. The result of this "source-jurisdiction" rule was that the country of residence did not assert jurisdiction to tax income from foreign sources. This freed the plaintiff's income from French taxation and would also free it from United States taxation if the Convention could be invoked. Treasury Regulations, section 514.104 (3), *supra,* was an effort to prevent this result. Therefore, even if the corporation was created or organized in France or under the laws of France, which the facts show it was not, the Company would not qualify as a corporation for purposes of the Convention.

■ Ultimately this case also turns on the intent and purpose of the Convention as agreed upon by the signatories. The purpose and intention of the Tax Convention between the United States and France was to avoid double taxation and to alleviate the problems arising from it. The parties to a bilateral agreement are primarily concerned with removing an obstacle to the flow of trade and investment between their two countries.

Double taxation arises when the jurisdiction of the tax authority where income arises overlaps the jurisdiction of the tax authority where the taxpayer resides. The agreement attempts to avoid double taxation between the signatories through adjusting their respective tax jurisdictions either by one party reducing the tax on certain types of income or completely surrendering the right to tax it. The country of residence will mitigate its claim based on the tax paid to the source country where the first method is not practicable.

The fact is that during the years in question plaintiff did not have a "fiscal domicile" or "residence" in France for French income tax purposes. Prior to 1957 the Company had always been free of French taxation. When it was subjected to French taxation, as when its securities were taxed, the Company was treated as a foreign corporation with respect to France. It is also interesting to note that subsequent to the French Legislative Act of June 1, 1957, the corporation was held not to be taxable in France on income connected with operation of the Canal. The United States sourced taxable income in issue arose from an activity closely connected with operation of the Canal, funding its pension obligations. The Company was not at any time during the years in question actually *subject to,* or *subjected to,* tax in France.

■■ The fact that the Company is motivated in its actions by the desire to minimize its tax burden can in no way be taken to deprive it of a benefit to which it is clearly entitled by an applicable treaty. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Johansson v. United States, 336 F.2d 809 (5 Cir., 1964). In determining the applicability of the treaty, we recognize the necessity for liberal construction. Jordan v. Tashiro, 278 U.S. 123, 49 S.Ct. 47, 73 L.Ed. 214 (1928). However, at the core of this issue we are not dealing with a problem of construction but with the intent and purpose of the treaty. A treaty, being a pact between two sovereigns, must be construed broadly to accomplish the intent of the contracting parties. American Trust Co. v. Smyth, 247 F.2d 149 (9 Cir., 1957). "To say that we should give a broad and efficacious scope to a treaty does not mean that we must sweep within the

Convention what are legally and traditionally recognized to be * * * taxpayers not clearly within its protections; * * *." Maximov v. United States, 373 U.S. 49, 56, 83 S.Ct. 1054, 1058, 10 L. Ed.2d 184 (1963).

As stated in *Maximov, supra,* "[i]t appears from the relevant materials instructive as to the intent of the parties to the Convention that the general purpose of the treaty was * * * to facilitate commercial exchange through elimination of double taxation resulting from both countries levying on the same transaction or profit; an additional purpose was the prevention of fiscal evasion." *Maximov, supra,* at 54, 83 S.Ct. at 1057.

The fact is that the plaintiff is not confronted with a problem of double or burdensome taxation that the treaty was designed to alleviate or eliminate. There is no double tax on the income of the plaintiff since it is not taxed in France. There is no obstacle to trade or commercial intercourse in the context of this case, and considerations of fiscal evasion are not involved. "We cannot * * * read the treaty to accord unintended benefits inconsistent with its words and not compellingly indicated by its implications." *Maximov, supra* at 55, 83 S.Ct. at 1057. "Our interpretation affords every benefit negotiated for by the parties to the Convention on behalf of their respective residents and prevents an unintended tax windfall to a private party." *Maximov, supra* at 56, 83 S.Ct. at 1058.

The plaintiff claims, based on the treaty, that an adverse decision would violate the rule of comity. This is not so because the only tax authority involved is that of the United States. If the United States surrendered its authority in accordance with the plaintiff's claim, it would gain nothing for which it negotiated under the treaty. Also, France has no interest in this matter because its authority to tax is not involved. France disclaimed its right to tax the income in dispute. United States' interests and benefits are the only ones involved relative to the Convention, therefore a result unacceptable to the plaintiff, either based on the Convention or indirectly structured through an unfavorable choice of law, in no way violates the principles of comity. The decision merely protects the principle of the Convention, avoidance of double taxation.

In consideration of the above-stated reasons we hold the plaintiff is not entitled to recover, and the petition is dismissed.

## CONCLUSION OF LAW

Upon the foregoing opinion, which contains the essential findings of fact as stipulated by the parties, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is dismissed.

