**COLUMBIA MARINE SERVICES, INC.,** Individually and on behalf of a class of plaintiffs similarly situated, Plaintiff–Appellant,

v.

**REFFET LIMITED, a United Kingdom corporation, et al.,** Defendants–Appellees.

No. 1107, Docket 88–7072.

United States Court of Appeals, Second Circuit.

Argued May 10, 1988.

Decided Nov. 2, 1988.

Jerome M. Congress, New York City (Milberg Weiss Bershad Specthrie & Lerach, New York City, Berger & Montague, and Saul, Ewing, Remick & Saul, Philadelphia, Pa., of counsel), for plaintiff-appellant Columbia Marine Services, Inc.

Richard J. Holwell, New York City (White & Case, David Sachs, Richard B. Sypher and Owen C. Pell, New York City, of counsel), for defendants-appellees U.K. Insurers.

Jay G. Safer, New York City (LeBoeuf, Lamb, Leiby & MacRae, William G. Primps and Gwenellen P. Janov, of counsel), for defendant-appellee Reffet Ltd.

Before VAN GRAAFEILAND, PIERCE and ALTIMARI, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Columbia Marine Services, Inc. appeals from a judgment of the United States District Court for the Southern District of New York (Sprizzo, J.) dismissing its class-action complaint against Reffet Limited and certain United Kingdom (U.K.) insurance companies. Columbia sought to recover retroactive refunds of federal excise taxes which Reffet, acting on behalf of appellee insurers, had obtained from the Internal Revenue Service pursuant to an international tax treaty between the United States and the United Kingdom. The district court granted appellees' Rule 12(b) motion to dismiss. We affirm.

Prior to 1975, U.K. insurance companies, not engaged in a trade or business in the United States so as to be subject to federal income taxes, were required to pay a federal excise tax (FET) on all insurance premiums charged to U.S. insureds. See 26 U.S.C. §§ 4371–4374; Rev.Rul. 80–225, 1980–2 C.B. 318. In 1975, the United States and the United Kingdom negotiated a treaty in which they agreed to make certain mutual concessions in their taxation of nationals of the other country. *Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains*, 31 U.S.T. 5668, T.I.A.S. No. 9682 (the Treaty). For its part, the United States agreed, among other things, to exempt U.K. insurers from the FET. Because of changes, protocols, and the nature of the ratification process, the Treaty did not enter into force until 1980. However, the FET exemption was made effective with respect to all excise taxes paid after January 1, 1975. Art. 28(2)(b). Consequently, the United States was required to refund the excise taxes which U.K. insurers paid between 1975 and 1980.

The Treaty set December 31, 1983 as the deadline for seeking refunds:

Notwithstanding any provisions of the respective domestic laws of the Contracting States imposing time limits for applications for relief from tax, an application for relief under the provisions of this Convention shall have effect, and any consequential refunds of tax made, if the application is made to the competent authority concerned within three years of

the end of the calendar year in which this Convention enters into force.

Art. 28(7). The "competent authority" in the United States is the "Secretary of the Treasury or his delegate," (the IRS). Art. 3(1)(f)(i).

Article 25(1) of the Treaty sets forth a procedure for resolving disputes arising as a result of the Treaty.

> Where a resident or national of a Contracting State considers that the actions of one or both of the Contracting States result or will result in taxation not in accordance with this Convention, he may, notwithstanding the remedies provided by the national laws of those States, present his case to the competent authority of the Contracting State of which he is a resident or national.

Article 25(3) authorizes the competent authorities of each nation to reach agreement with aggrieved parties concerning the attribution of income, deductions, credits or allowances, Art. 25(3)(a), (b), and the meaning of terms not otherwise defined in the Treaty, Art. 25(3)(d).

Following ratification of the Treaty, the IRS established a procedure for refunding the FET collected between 1975 and 1980:

> The treaty provisions exempting policies of insurance from the excise tax and providing for refund of such tax were intended to relieve the person that bore the burden of the tax. However, the person who remitted the tax must file the claim on behalf of the person who bore the burden of the tax. The Service understands the general practice in the insurance industry to be that the person required to remit the tax will either subtract the amount of the tax from the premium paid to the foreign insurer or reinsurer, or add the amount of the tax to the premium charged to the insured. Where the person required to remit the tax subtracts the amount of the tax from the premium paid to the foreign insurer or reinsurer and the insured pays only the amount of the premium on which the tax imposed by section 4371 of the Code was computed, the insurer or reinsurer is considered to have borne the burden of the tax and is entitled to the refund. Where the person required to remit the tax adds the amount of the tax to the amount of the premium on which the tax was computed and the insured pays the amount of the premium plus the amount of the tax, the insured is considered to have borne the burden of the tax and is entitled to the refund.

Rev.Proc. 81–3 § 2.06, 1981–1 C.B. 618.

In order to facilitate the processing of refund claims, the U.K. insurers formed Reffet, a British not-for-profit corporation, which negotiated with the IRS on behalf of the insurers. By the end of 1981, Reffet and the IRS settled upon a simplified procedure, embodied in a Closing Agreement, by which U.S. brokers could file for refunds on behalf of the U.K. insurers. Following the agreed procedure, U.S. brokers obtained approximately $150 million in FET refunds for U.K. insurers who had "borne the burden" of the FET payments.

The purpose and intent of the Treaty, as stated in its caption and preamble, was the "avoidance of double taxation". So far as is pertinent herein, the double taxation referred to was "the tax on insurance premiums paid to foreign insurers," Art. 2(2)(a), which constituted double taxation when combined with the U.K. income tax on the same premiums. Although Columbia, a purchaser of insurance from a U.K. insurer, cannot claim to be a victim of such double taxation, *see Maximov v. United States*, 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963), it nonetheless contends that it and the members of a proposed class of purchasers have the right "under the Treaty" to have the FET refunds paid to them. Columbia's complaint contains three separate causes of action, all of which are based on this supposed Treaty right. In its first cause of action captioned "FIRST CLAIM FOR RELIEF (Under the Treaty)" Columbia seeks recovery directly under the Treaty. In its "SECOND CLAIM FOR RELIEF (Common Law Conversion)" Columbia asserts that the U.K. insurers converted the FET refunds that belonged to the insured. Columbia's "THIRD CLAIM FOR RELIEF (RICO, 18

U.S.C. § 1961, *et seq.*)" alleges a violation of ubiquitous RICO. The district court properly dismissed all three claims.

## DISCUSSION

██ Federal courts have subject matter jurisdiction over "all civil actions arising under ... treaties of the United States." 28 U.S.C. § 1331. An action arises under a treaty only when the treaty expressly or by implication provides for a private right of action. The treaty must be self-executing; *i.e.*, it must "prescribe[ ] rules by which private rights may be determined." *Dreyfus v. Von Finck*, 534 F.2d 24, 30 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 808 (D.C.Cir.1984) (Bork, J., concurring), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Moreover, where, as here, a treaty addresses the issue of subject matter jurisdiction, "it operates as an absolute bar to federal jurisdiction in cases falling outside its terms." *Gayda v. LOT Polish Airlines*, 702 F.2d 424, 425 (2d Cir.1983).

The 1975 Treaty contains two provisions regarding possible remedies of private parties. Article 28(7) instructs persons entitled to a refund of FET to file a claim with the IRS within three years of the enactment of the Treaty. Article 25(1) instructs all others who dispute taxation under the Treaty to petition the competent authority of the taxing nation, here the IRS. Columbia has done neither. The U.K. insurers, on the other hand, have pursued the remedies specifically prescribed by the Treaty. Acting through the brokers who paid the tax, they applied for relief to the "competent authority", which made a determination of entitlement in accordance with the authority given it in the Treaty. As the district court held, nothing expressed or implied in the Treaty supports Columbia's FIRST CLAIM FOR RELIEF.

██ Questions of jurisdiction aside, when we look to the four corners of the Treaty and its stated purpose of eliminating double taxation resulting from both Treaty parties levying on the same transac-

tion, the conclusion is inevitable that Columbia has no Treaty right to the FET refunds at issue herein. *Maximov v. United States, supra*, 373 U.S. at 52–56, 83 S.Ct. at 1056–58; *Compagnie Financiere de Suez et de L'Union Parisienne v. United States*, 492 F.2d 798, 810–11, 203 Ct.Cl. 605 (1974); *American Trust Co. v. Smyth*, 247 F.2d 149, 152–54 (9th Cir.1957).

As stated above, the Treaty was designed expressly to eliminate the tax on insurance premiums paid to foreign insurers. This was the understanding of the Senate when it ratified the Treaty. "U.K. insurance companies not engaged in a U.S. trade or business will no longer be subject to the insurance excise tax." Report of the Senate Committee on Foreign Relations, S.Exec.Rep. No. 18, 95th Cong., 2d Sess. 17 (1978). "The proposed protocol amends the proposed treaty so that it expressly provides that insurance premiums paid to a British insurer will not be subject to the U.S. insurance excise tax even if it has a U.S. permanent establishment." Report of the Senate Committee on Foreign Relations, S.Exec.Rep. No. 5, 96th Cong., 1st Sess. 6–7 (1979). "For example, we have agreed to exempt all British insurance companies from paying the customary insurance excise tax." 124 Cong.Rec. 18421 (June 22, 1978) (Remarks of Senator Church during Senate floor debate).

It is inconceivable that either the Treaty signatories or the ratifying Senators intended the refund provisions of the Treaty to be a $150 million bonanza to United States companies or individuals simply because they purchased insurance from U.K. insurers. Indeed, if Congress had intended to extend this multi-million dollar benefit only to United States insureds, it could have accomplished that result without an international treaty.

Columbia seeks by analogy to bring this case within section 6416 of the Internal Revenue Code, which provides that when excise taxes imposed under chapters 31 and 32 of the Code are to be refunded, the person who paid the tax may receive the refund only upon a showing that he did not "pass on" the tax to the purchaser. This

reliance is misplaced. Section 6416 applies only to taxes imposed by chapters 31 (retailers' taxes) and 32 (manufacturers' taxes). The excise tax on insurance premiums paid to foreign insurers, sections 4371–74, is codified under chapter 34.

 In the absence of a countervailing statute such as section 6416, tax liabilities and credits are not determined by where or upon whom the burden of the tax ultimately falls. *Biddle v. Commissioner*, 86 F.2d 718, 720–21 (2d Cir.1936), *aff'd*, 302 U.S. 573, 58 S.Ct. 379, 82 L.Ed. 431 (1938); *Shearer v. Commissioner*, 48 F.2d 552, 554–55 (2d Cir.1931). Absent a statutory provision recognizing the burden of an excise tax to be on the ultimate consumer, it is the manufacturer or producer upon whom the legal incidence of the tax customarily falls. *Gurley v. Rhoden*, 421 U.S. 200, 204–05, 95 S.Ct. 1605, 1608–09, 44 L.Ed.2d 110 (1975). Although a purchaser may pay more for the product because of the tax, this does not mean that the purchaser paid the tax. *Lash's Products Co. v. United States*, 278 U.S. 175, 176, 49 S.Ct. 100, 73 L.Ed. 251 (1929); *123 East Fifty–Fourth Street, Inc. v. United States*, 157 F.2d 68, 70 (2d Cir.1946).

Section 4374 of the Code provides that the tax at issue herein "shall be paid, on the basis of a return, by any person who makes, signs, issues, or sells any of the documents and instruments subject to the tax, or for whose use or benefit the same are made, signed, issued, or sold." Neither the statute nor the Treaty identifies the proper recipient of the 1975–1980 refunds. The IRS concluded, however, that the refund provisions of the Treaty were intended to relieve the person that bore the burden of the tax, and it provided a simple and logical test for determining where that burden lay. When the tax was included in the premium charged, the burden was borne by the insurer; when it was added as a separate item to the premium charged, the burden was borne by the insured.

The logic of the rule is apparent. The FET is levied on the gross premium paid by the insured. Treas.Reg. (26 C.F.R.) 46.-4371–3(b). Because it would have inured to an insurer's benefit to have the amount of the tax separated from the premium and billed separately, it is unlikely that any insurer would have refused an insured's request to do this. If the insurer did refuse, the insured could take his business elsewhere. *See 123 East Fifty–Fourth Street, Inc. v. United States, supra,* 157 F.2d at 70. Absent separate billing of the FET, it would be difficult, if not impossible, to determine how much of the tax burden each of the 216 defendant insurers passed on to each of its many customers. The "bright-line test", as the district court described the IRS rule, is fair and comports with well established principles of law.

The internal revenue statute that is most analogous to the situation presented herein is section 7422. The Treaty provisions for a retroactive refund of the FET for the years 1975–1980 in effect converted the taxes paid during those years into overpayments. *See Brown & Williamson, Ltd. v. United States,* 688 F.2d 747, 749, 231 Ct.Cl. 413 (1982). Section 7422(a) provides in substance that no suit may be brought for overpayment of taxes until a claim for refund or credit has been duly filed with the IRS. Section 7422(f) provides that such a suit may be maintained only against the United States. As former Judge Weinfeld wrote in *DuPont Glore Forgan Inc. v. American Tel. & Tel. Co.,* 428 F.Supp. 1297, 1303–04 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1367 (2d Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 465, 58 L.Ed.2d 431 (1978):

> The government, of course, has a vital interest not only in collecting taxes that are due but also in assuring that refunds are made only to those entitled to them. To permit private litigation for the recovery of tax refunds may defeat that purpose.

 The IRS, complying with the provisions of both statute and Treaty, has determined that the U.K. insurers are entitled to the bulk of the FET collected between 1975 and 1980. Columbia, which has neither filed a claim with the IRS nor sued it, nonetheless seeks to prove in this action that the IRS made a mistake. This it cannot do. The IRS is the real party in inter-

est and should have been proceeded against in the proper manner. *See Econ, Inc. v. Illinois Bell Tel. Co.,* 351 F.Supp. 1087, 1089 (N.D.Ill.1972).

Columbia does not strengthen its case by alleging a claim in conversion. Although in some instances money, like any other chattel, may be converted, a mere claim that a sum of money, not specifically identifiable, has been paid out of general funds by an alleged debtor to a third party, will not support an action against the third party for conversion. *Marine Midland Bank v. Russo Produce Co.,* 65 A.D.2d 950, 952, 410 N.Y.S.2d 730 (1978) (mem.), *modified on other grounds,* 50 N.Y.2d 31, 427 N.Y.S.2d 961, 405 N.E.2d 205 (1980); *Northern Trust Co. v. Chase Manhattan Bank,* 582 F.Supp. 1380, 1386 (S.D.N.Y. 1984). A plaintiff must establish legal ownership or right to possession in the particular thing, the specifically identifiable moneys, that the defendant is alleged to have converted. *Independence Discount Corp. v. Bressner,* 47 A.D.2d 756, 757, 365 N.Y.S.2d 44 (1975) (mem.); *King v. King,* 13 A.D.2d 437, 440, 218 N.Y.S.2d 230 (1961); *Laurent v. Williamsburgh Sav. Bank,* 28 Misc.2d 140, 143–44, 137 N.Y.S.2d 750 (1954). On the undisputed facts, Columbia cannot show that it had ownership or possessory rights in the unidentified moneys paid out of IRS general funds to the U.K. insurers.

In any event, since Columbia concedes that its "conversion claim is premised on the right to the refund[s] created by the Treaty", Appellant's Brief at 28 n. **, and since, as we hold, Columbia has no right to refunds paid to the U.K. insurers, there is no merit in Columbia's "SECOND CLAIM FOR RELIEF (Common Law Conversion)". Assuming that Columbia paid more for U.K. insurance than it would have paid had there been no excise tax levied against the U.K. insurers, once Columbia paid the price, the moneys paid belonged to the insurers. *123 East Fifty–Fourth Street, Inc. v. United States, supra,* 157 F.2d 70. So also did the moneys that were refunded.

Concluding, as we do, that the U.K. insurers were entitled to the FET refunds they received, we see no need to discuss Columbia's tortuous attempts to allege that the U.K. insurers secured such refunds in an unlawful manner. In short, no RICO violation was alleged.

The judgment of the district court is affirmed.