**UNITED STATES of America,**

v.

**Reginald RODRIGUES, Defendant.**

**No. CRIM. A. CR–98–0686.**

United States District Court,
E.D. New York.

Sept. 28, 1999.

---

Cynthia Monaco, U.S. Attorney's Office, Criminal Div., Brooklyn, NY, for U.S.

Robert S. Wolf, New York City, Heidi C. Poreda, the Legal Aid Society, Federal Defender Div., Brooklyn, NY, for Reginald Rodrigues.

Estelle Jana Roond, New York City, for Frank Wray.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

On July 2, 1998, defendant Reginald Rodrigues ("Rodrigues") was indicted on three counts of federal narcotics charges: conspiracy to distribute and possession with the intent to distribute a Schedule II controlled substance (cocaine), conspiracy to import a Schedule II controlled substance (cocaine) into the United States, and possession of a Schedule II controlled substance (cocaine) with the intent to distribute.

On May 26, 1999, Rodrigues moved to have all his post-arrest statements suppressed on the ground that the government questioned him in violation of Article 36 of the Vienna Convention on Consular Relations.[1] Apr. 24, 1963, 21 U.S.T. 77,

---

1. Previously, Rodrigues had moved to suppress his postarrest statements on the ground they were not voluntary. That motion was denied, except for one statement he made at the end of his interrogation. *See* Transcript of Hearing, dated Jan. 29, 1999 at 86 [hereinafter "Jan. Tr."]. At the January hearing, with the agreement of the court, Rodrigues' coun-

T.I.A.S. No. 6820 [hereinafter "Article 36" or "the Convention"]. On June 14, 1999, the government responded to defendant's motion.

## Background

On June 5, 1998, several shipping containers, with a bill of lading listing J & W Seafood Vegetable and Fruits Corp., 125 Mott Street, New York, New York as consignee, arrived at Philadelphia's port from Guyana. *See* Letter from Karen R. Sage, Esq., Assistant U.S. Attorney, dated Dec. 15, 1998 at 1 [hereinafter "Dec. Ltr."].[2] According to its manifest, the containers held frozen headless sea trout; however, upon inspection, customs officers found two containers filled with boxes labeled frozen shrimp. *See id.* Two of these boxes actually contained 25 kilos of a white substance which later proved to be cocaine. *See id.* Customs agents refilled the two frozen shrimp packages with a "sham load" that included an electronic tracking device. *See id.* All the containers were then released from customs, unloaded, and brought to a cold storage facility in Brooklyn, New York. *See id.*

Surveillance of the cold storage facility on June 9, 1998 revealed a man, later identified as defendant Rodrigues, taking the two boxes containing the tracking device out of storage, loading them into the back of a white van, and boarding the van himself. *See id.* The van went to 295 East 38th Street in Brooklyn, where Rodrigues took the two boxes into an apartment building.[3] *See id.* at 2. Frank Wray arrived at the building soon thereafter, and both Wray and Rodrigues transferred the boxes from the apartment building to the trunk of Wray's car. *See id.* Wray then drove alone to 1455 St. Johns Place, Brooklyn, where he was arrested in the hallway outside his apartment door. *See id.*

Rodrigues was arrested a short time later outside the front door of 295 East 38th Street, Brooklyn. *See* Jan. Tr. at 31. Since Rodrigues did not have any ID on him at the time of his arrest, one of the customs agents instructed him to ask a friend to go inside and get his passport, which he did.[4] *See id.* at 32–33. Once the passport was obtained, Rodrigues was transported to the World Trade Center, where he was processed and placed in a room to be questioned. *See id.* at 40–41. As part of the processing routine, Rodrigues completed a "Personal History Report" (DEA Form—202) on which he indicated he was a citizen of Guyana and had a permanent address there, as well as immediate family. *See* Letter from Robert S. Wolf, Esq., dated May 26, 1999, Ex. A [hereinafter "May Ltr."].

Later that same evening, June 9, 1998, two customs agents, Quintana and O'Brien, interviewed Rodrigues. *See* Jan. Tr. at 41. Agent Quintana began the interview by asking Rodrigues if he understood English; Rodrigues responded that English was his first language. *See id.* at 44. Agent Quintana then read Rodrigues the *Miranda* warnings listed on a card the agent regularly used for this purpose. *See id.* at 29; *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Agent Quintana testified that Rodrigues

---

sel reserved the right to raise the Vienna Convention issue at a later date. *See id.* at 87.

**2.** The facts recited in AUSA Sage's letter are uncontested, except for a sentence on page two that states Rodrigues was arrested at his home. *See* Jan. Tr. at 5, 6, & 8.

**3.** Joseph Walton, who drove the van, was arrested but not charged. *See* Jan. Tr. at 4. Rodrigues was staying at Walton's basement apartment located at 295 East 38th Street,

Brooklyn. *See id.* at 33. Frank Wray was also arrested, indicted as a codefendant with Rodrigues, and subsequently pled guilty.

**4.** Since Rodrigues had flown into New York from Guyana that same morning, the arresting agents assumed he was carrying a passport. *See* Jan. Tr. at 33. The agents knew Rodrigues had just arrived because he related this information to an undercover agent in a conversation they had while waiting for the containers to be unloaded. *See id.* at 32.

"clearly said he understood [the warnings] and [that] he would be willing to speak with us." *Id.* Neither of the agents amplified the *Miranda* warnings in any way; nor did they inform Rodrigues of his right under the Convention to contact his consulate. *See id.* at 45; Article 36, ¶ 1(b).

In response to their questions, Rodrigues told the agents that he was the shipper/exporter of the containers from Guyana and that he was the person responsible for completing the manifest, bill of lading, and customs documents. *See* Dec. Ltr. at 2; Jan. Tr. at 30, 52. He said he had flown into JFK airport early that same morning (June 9, 1998), having left Guyana as soon as he was notified the containers had cleared customs. *See* Jan. Tr. at 30. He also admitted to the agents that he knew there was cocaine in the boxes labeled frozen shrimp and that he had been given instructions by an unnamed source in Guyana to notify Wray when the shipment arrived and to give Wray the boxes. *See id.* These statements were presented to the Grand Jury and formed part of the basis for Rodrigues' indictment.

## Discussion

### (1)

Article 36 of the Vienna Convention on Consular Relations, to which both the United States and Guyana are parties, states, in relevant part:

Article 36: Communication and contact with nationals of the sending State

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officials shall be free to communicate with the nationals of the sending State and to have access to them ...;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.... The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation....

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

The government does not dispute that Article 36, ¶ 1(b) of the Convention was violated in this case. Agent Quintana admitted that although he and his partner were aware Rodrigues was a citizen of Guyana, neither agent advised him of his right to consult with his consulate. *See* Jan. Tr. at 42, 45. What is contested here, and what has been at issue in numerous cases across the country, is what the appropriate judicial remedy is, if any, for an Article 36 violation. Before turning to this matter, however, two threshold issues must be addressed: does a foreign national have standing to assert a violation of Article 36 and, if so, what must a foreign national show to be entitled to relief?

### (2)

The general rule is that since international treaties are agreements between two or more sovereign states, they normally do not create personal rights enforceable in court by an individual. *See, e.g., United States v. Reed,* 639 F.2d 896, 902 (2d Cir.1981) ("[A]bsent protest or objection by the offended sovereign, [an individual] has no standing to raise violation of international law as an issue."). A treaty may, however, specifically confer upon individuals the right to enforce the provi-

sions of the treaty. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442, 109 S.Ct. 683, 692, 102 L.Ed.2d 818 (1989); *Columbia Marine Servs., Inc. v. Reffet Ltd.*, 861 F.2d 18, 21 (2d Cir.1988) ("An action arises under a treaty only when the treaty expressly or by implication provides for a private right of action.").

The text of the Vienna Convention does not contain a clear statement on individual rights. While the introduction to Article 36 indicates that the purpose of the article is to facilitate consular functions, subsection (a) explicitly gives foreign nationals the right of free access to their consulates. *See* Article 36, ¶ 1(a). Further, subsection (b) states that there is a duty to notify not only the relevant consular official of the defendant's arrest, but also to notify the arrestee of his or her right to contact the consulate. *See id.* at ¶ 1(b) ("The said authorities shall inform the person concerned without delay of **his rights** under this sub-paragraph ....") (emphasis added).

Somewhat contradictory language is to be found in a clause of the preamble to the entire Convention which reads: "Realizing the purpose of such privileges and immunities is **not to benefit individuals** but to ensure the efficient performance of functions by consular posts...." *Id.* preamble (emphasis added). Although this clause is regularly cited as proof that the Convention was not intended to create individual rights, it seems more reasonable to interpret the word "individuals" here as referring to consular officials, not foreign nationals. *See* Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul*, 18 Mich. J. Int'l L. 565, 594 (Summer 1997). Thus, it appears that the purpose of this clause is not to restrict the individual notification rights of foreign nationals, but to make clear that the Convention's purpose is to ensure the smooth functioning of consular posts in general, not to

provide special treatment for individual consular officials. *See id.*

Any ambiguity found in the Convention's text regarding individual rights is clarified by examining the debate surrounding the adoption of Article 36. Statements made by the international representatives who drafted Article 36 indicate that paragraph 1(b) was specifically intended to create an individual right to be notified of the Convention's protections. *See id.* at 596–99 & nn. 191–209 (quoting various delegates' statements both in support of and against including language in Article 36 that would implicate individual rights). The conference participants debated the appropriateness of using the Convention to create individual rights, eventually deciding to adopt language which safeguards a foreign national's right to be informed. *See id.* at 599. There was no discussion, however, about the ramifications of, or the remedy for, any breach of this provision.

Moreover, most courts in the United States have recognized that Article 36 does create standing for foreign nationals to assert their individual rights under the Convention. *See, e.g., Breard v. Greene*, 523 U.S. 371, ——, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998) ("The Vienna Convention—which arguably confers on an individual the right to consular assistance following arrest...."); *United States v. Lombera–Camorlinga*, 170 F.3d 1241, 1243 (9th Cir.1999) (recognizing that individual rights established by Article 36 give defendants standing); *United States v. Torres–Del Muro*, 58 F.Supp.2d 931, 932–33 (C.D.Ill.1999) (same); *United States v. Hongla–Yamche*, 55 F.Supp.2d 74, 77–78 (D.Mass.1999) (same); *United States v. Alvarado–Torres*, 45 F.Supp.2d 986, 989 (S.D.Cal.1999) (same); *United States v. Chaparro–Alcantara*, 37 F.Supp.2d 1122, 1125 (C.D.Ill.1999) (same); *United States v. $69,530.00 in United States Currency*, 22 F.Supp.2d 593, 594 (W.D.Tex.1998). *But see United States v. Salameh*, 54 F.Supp.2d 236, 279–80 (S.D.N.Y.1999)(declining to "wade into the morass over the

existence of [ ] a private right of action"); *United States v. Tapia–Mendoza*, 41 F.Supp.2d 1250, 1254–54 (D.Utah1999) (finding it "doubtful that such a private right exists"); *United States v. Esparza–Ponce*, 7 F.Supp.2d 1084, 1096 (S.D.Cal. 1997) ("The Court need not definitively decide this muddled issue [of individual rights]."); *Republic of Paraguay v. Allen*, 949 F.Supp. 1269, 1274 (E.D.Va.1996), *aff'd* 134 F.3d 622 (4th Cir.1998) (suggesting that no private individual rights are created by the Convention).

Additionally, foreign signatory nations such as Mexico, Canada, Paraguay, and Argentina have recognized that the Convention does create individual notification rights. *See* Kadish, *supra*, at 601–02 & nn. 222–27. In light of the above, the better reading of the treaty is that a foreign national does have standing to assert his or her right to consular notification under Article 36 of the Convention. However, for purposes of the instant case, standing will be assumed, but need not be decided.

(3)

■ As a further preliminary issue, courts have unanimously held that in order for a foreign national to win relief for a Convention violation, he or she must show that the lack of consular notification prejudiced his or her case. *See, e.g., Breard*, 523 U.S. at ——, 118 S.Ct. at 1355 (plaintiff unable to prove the prejudice necessary to obtain relief under the Vienna Convention); *Waldron v. INS*, 17 F.3d 511, 518 (2d Cir.1994), *cert. denied*, 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994); *United States v. Kevin*, No. 97 CR 763, 1999 WL 194749, at *4 (S.D.N.Y. Apr. 7, 1999). This requirement is based on the premise that a plaintiff seeking remedy for a violation of an agency regulation that "does not affect fundamental rights" bears a heavier burden than a plaintiff alleging the violation of an agency "regulation [ ] promulgated to protect a fundamental right derived from the Constitution."

*Waldron*, 17 F.3d at 518 (addressing the violation of an INS regulation enacted to ensure compliance with Article 36). While no showing of prejudice needs to be made to warrant a remedy of a constitutionally-based violation, prejudice must be demonstrated to warrant a remedy for the former type of violation. *See id.*

Thus, by analogy, foreign nationals asserting Convention violations must show prejudice, since their right to consular notification is derived from a treaty that does not implicate fundamental rights and, therefore, must be treated the same as a violation of any other non-constitutional right. *See United States v. Caceres*, 440 U.S. 741, 755, 99 S.Ct. 1465, 1473, 59 L.Ed.2d 733 (1979) (holding exclusion of evidence inappropriate where the IRS violated an internal wiretap regulation since "none of respondent's constitutional rights ha[d] been violated"); *Esparza–Ponce*, 7 F.Supp.2d at 1097 ("[A] violation of the Convention does not rise to the level of a Miranda violation. Applying the presumption of prejudice mandated by Miranda is therefore inappropriate."). As the Second Circuit stated in *Waldron:* "Although compliance with our treaty obligations clearly is required, we decline to equate such a provision with fundamental rights, such as the right to counsel, which traces its origins to concepts of due process." 17 F.3d at 518.

■ Rodrigues is unable to show he was prejudiced by the custom agents' failure to notify him of his right to contact his consulate. The only information submitted in an attempt to show prejudice is offered by Rodrigues' counsel in a letter to this court.[5] *See* May Ltr. at 3–4. The first claim is that Rodrigues was prejudiced by not being notified of his right to consular communication because he made incriminating statements to the interrogating agents, providing them with critical evidence against him. *See id.* at 3. The sec-

---

**5.** Rodrigues has not submitted any affidavit from any Guyanese consulate official detailing

how Rodrigues was prejudiced by not being informed of his right to contact his consulate.

ond claim is that had Rodrigues contacted his consulate, "it is more than reasonable to assume" he would have invoked his right to counsel and not made any post-arrest statements. *Id.* at 4. Neither of these claims amounts to a showing of prejudice.

First, Rodrigues' assertion that he would not have waived his *Miranda* rights had he been told of his right to communicate with his consul is dubious. Agent Quintana's testimony at the suppression hearing indicates Rodrigues was completely willing to talk with the agents. *See* Jan. Tr. at 28–30, 46, 50. However, even if his assertion is accepted, there is no requirement in the Convention that the interrogation of a foreign national must stop when he is told of Article 36's consular notification provision. On the contrary, the language of Article 36 only requires that a foreign national be informed of his or her rights "without delay," and then, if consular contact is requested, that notification also be made "without delay." *See* Article 36, ¶ 1(b). "Without delay" has been interpreted by the State Department to mean compliance with the Convention within 24 to 72 hours of the request, during the consulate's normal business hours. *See* U.S. Dep't of State, *Consular Notification & Access*, Pt. 3: Frequently Asked Questions (Jan.1998) <http://www.state.gov/www/global/legal_affairs>. There is no prohibition anywhere in the Convention against continuing to question a foreign national while awaiting consular contact. *See Alvarado–Torres*, 45 F.Supp.2d at 991; *Chaparro–Alcantara*, 37 F.Supp.2d at 1126–27. Therefore, even if Rodrigues had been notified under Article 36 and requested contact with his consul, the customs agents could still have rightfully sought to secure a waiver of his *Miranda* rights or continue the questioning had they already obtained a waiver.

Likewise, Rodrigues' claim that he would have not made any post-arrest statements if he had been able to speak to a consular official is unconvincing. Although Rodrigues was not informed of his right to consular notification, he was given his *Miranda* warnings, which he indicated he understood and then waived. *See supra* p. 4. Prejudice has never been—nor could reasonably be—found in a case where a foreign national was given, understood, and waived his or her *Miranda* rights. Courts have uniformly found that no prejudice can exist in that situation, because the advice a consular official would give would simply augment the content of *Miranda*, which the foreign national has already waived. *See, e.g., Alvarado–Torres*, 45 F.Supp.2d at 990–91 (finding that the consul's advice would have been cumulative, adding nothing to the *Miranda* warnings); *Tapia–Mendoza*, 41 F.Supp.2d at 1254–55 (same); *Chaparro–Alcantara*, 37 F.Supp.2d at 1126–27 (same); *see also Murphy v. Netherland*, 116 F.3d 97, 100–01 (4th Cir.1997) (defendant could not establish prejudice since he failed to explain how contacting his consulate would have changed his guilty plea/sentence).

As Rodrigues was fully informed of his constitutional rights to remain silent and to have an attorney and since he waived those rights, he cannot now successfully assert prejudice due to a failure to be informed of his less weighty right to consular notification. *See Alvarado–Torres*, 45 F.Supp.2d at 991. Additionally, there is no evidence that the Guyanese consulate in New York regularly provides any assistance at all to its citizens who are arrested, let alone evidence that the local official makes it a regular practice to tell arrestees not to talk to the authorities until they have consulted an attorney. Thus, it is impossible for Rodrigues to make a showing of prejudice on the present record.

(4)

Turning to the heart of the matter, even if Rodrigues were somehow able to establish prejudice due to a violation of Article 36 of the Convention—e.g., proving that the local consular official's regular

practice is to appear immediately after a national's arrest and advise him or her not to submit to questioning—suppression of his statements is not an appropriate remedy. The exclusionary rule is a remedy available to prevent violations of individual constitutional rights. *See, e.g., Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) (applying the exclusionary rule to violations of the Sixth Amendment right to counsel); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (applying the exclusionary rule to violations of the Fourth Amendment right to privacy); *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) (applying the exclusionary rule to violations of the Fifth Amendment right to silence). Exclusion as a remedy was established to deter governmental actors from impinging on fundamental rights and "should only be employed when those values are implicated." *$69,530.00 in United States Currency,* 22 F.Supp.2d at 595; *see Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 1191, 131 L.Ed.2d 34 (1995) ("The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations of . . . [constitutional] rights through the rule's general deterrent effect."); *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960) ("[The] purpose [of the exclusionary rule] is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."). As the effect of apply-ing the exclusionary rule is the loss of relevant and probative evidence, this remedy is not applied for every violation of a federal law but is reserved only for breaches of the most basic constitutional rights.[6]

As indicated above, failing to satisfy the consular notification requirement of Article 36 does not rise to the level of a constitutional violation. *See supra* pp. 183–85. As the Fourth Circuit aptly summarized: "Just as a [government actor] does not violate a constitutional right merely by violating a federal statute, it does not violate a constitutional right merely by violating a treaty." *Murphy,* 116 F.3d at 100; *see also $69,530.00 in United States Currency,* 22 F.Supp.2d at 595 ("A convention or treaty signed by the United States does not alter or add to our Constitution. Such international agreements are important and are entitled to enforcement, as written, but they are not the bedrock and foundation of our essential liberties and accordingly should not be cloaked with the . . . [exclusionary remedy] that protects those liberties." (footnote omitted)). Consular notification is not a fundamental right derived from the Constitution nor is it, in the words of Justice Cardozo, "the very essence of a scheme of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). The principal justification for excluding relevant evidence—to reduce governmental infringement on fundamental constitutional rights—is not implicated when Article 36 of the Convention is violated.[7]

6. A possible exception to this general rule is the *McNabb–Mallory* delay-in-presentment line of cases in which the Supreme Court excluded confessions not on the basis of a constitutional violation, but due to a violation of Federal Rules of Criminal Procedure 5(a). *See Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). The continued viability of these cases is doubtful. 18 U.S.C. § 3501(a) now provides: "In any criminal prosecution brought by the United States or by the District of Columbia, a confession, . . . shall be admissible in evidence if it is volun-tarily given." This statute was recently discussed by the Fourth Circuit in the *Miranda* context. *See United States v. Dickerson,* 166 F.3d 667 (4th Cir.1999). Even if 18 U.S.C. § 3501(a) cannot supersede *Miranda,* it certainly can constitutionally override a rule of federal criminal procedure on which the *McNabb–Mallory* line of cases rest.

7. No case addressing this issue has ever explicitly held that exclusion of evidence is an appropriate remedy for an Article 36 violation. Recently, however, the Ninth Circuit hinted that suppression may be proper. *See United States v. Lombera–Camorlinga,* 170

Moreover, keeping in mind that the Vienna Convention is an international agreement, the method by which other signatory nations remedy violations of Article 36 is of some significance. According to the State Department, all signatory countries remedy breach of Article 36's notification provision through traditional diplomatic, not judicial, channels. *See* Verbatim Transcript of Oral Argument before the International Court of Justice in the case concerning the Application of the Vienna Convention on Consular Relations (Para. v.U.S.) ¶ 2.15 (Apr. 7, 1998) (comments of Catherine Brown, Esq., Asst. Legal Advisor for Consular Affairs, U.S. Dept. of State) <http://www.icj-cij.org>. A letter of protest is first sent by the consular official who failed to receive the notice required by the Convention. *See id.* If a violating state chooses to investigate the matter and subsequently finds its law enforcement officials did not comply with Article 36, the most significant action taken is a formal apology to the grieved consulate and a promise to improve the notification system to ensure future compliance. *See id.* None of the almost 200 signatory states allows an Article 36 failure to affect their criminal proceedings in any way whatsoever. *See id.* This practice is "consistent with the fact and common international understanding that consular assistance is not essential to the criminal proceeding against the foreign national." *Id.*

More importantly, should United States courts hold that suppression is a proper remedy for violating the Convention, we would not only be the first and only nation to do so, but such a decision would also border on the self-destructive. This is because our courts are precluded from drawing any negative inferences from a criminal defendant's silence at trial. *See Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965) ("[T]he Fifth Amendment ... forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."). If a defendant's earlier incriminating statements, obtained in accordance with constitutional requirements, are excluded from evidence because of a violation of the Convention and the defendant then elects to exercise his or her right to silence at trial, important evidence will be lost and likely not be recovered subsequently since "any lawyer worth his salt will tell the suspect ... to make no statement." *Watts v. Indiana*, 338 U.S. 49, 59, 69 S.Ct. 1357, 1358, 93 L.Ed. 1801 (1949) (Jackson, J., concurring in part and dissenting in part).[8]

F.3d 1241, 1244 (9th Cir.1999). The court made an analogy to the remedy for a violation of the INS regulation implementing Article 36, which is to preclude the subsequent prosecution of the foreign national for illegal entry. *See id.* However, the court did not expressly approve of suppression as a remedy; instead, it remanded the case to the district court to determine if the requisite prejudice existed. *See id.*

8. The paradox of *Griffin* is that, under the broad interpretation it has been given to protect a defendant's rights at trial in cases like *Mitchell v. United States*, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (holding that "no negative inference from the defendant's failure to testify is permitted" at a sentencing hearing), *Griffin* has paralyzed any effort to reform our pretrial investigative process. Since only about seven percent of criminal cases actually go to trial, in most instances the pretrial stage is the critical point for assuring a just outcome. *See* Bureau of Justice Statistics, U.S. Dept. of Justice, *Sourcebook of Criminal Justice Statistics 1997* 400, tbl. 5.23. For example, any possibility of supplanting our current system of jailhouse questioning by a system of investigative questioning in open court in the presence of a suspect's lawyer is, because of *Griffin*, impossible at present. Any such change in our criminal procedure would be intolerable, because our society cannot afford to loose the opportunity to obtain voluntary confessions as a method of criminal investigation. *See Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966) (Warren, C.J.) ("Confessions remain a proper element in law enforcement."). However, if there were a rule that permitted comment at trial on a suspect's refusal during pretrial proceedings to answer relevant questions in the presence of counsel, then it might be possible to prohibit jailhouse questioning in the absence of a suspect's law-

Contrary to the legal situation in the United States, in most other democratic countries, defendants—even those represented by counsel—must answer the questions put to them or risk adverse legal or factual inferences being drawn against them. Thus, as a result of the *Griffin* decision, the enforcement of our criminal laws would be affected more adversely by suppression then that of any other country which might chose to adopt an exclusionary rule as a remedy for a violation of the Convention.

While most, if not all, democratic countries have an equivalent of our Fifth Amendment privilege against self-incrimination, none of them—including Great Britain, the country from whom we derive the privilege—has interpreted it in as broad a manner as we have. Indeed, in 1995, Great Britain expanded its long-established practice of allowing judges to comment on a defendant's silence. *See* Richard Card & Richard Ward, *The Criminal Justice & Public Order Act 1994* 155–57 (1994); Gregory W. O'Reilly, *England Limits the Right to Silence and Moves Towards an Inquisitorial System of Justice*, 85 J.Crim. L. & Criminology 402, 429 (Fall 1994). Now both judges and prosecutors may invite the jury to draw "such inferences as appear proper" from the defendant's silence during police interrogation and at trial, including an inference of guilt.[9] *See* The Criminal Justice and Public Order Act 1994, § 35(3) (Eng.); Card & Ward, *supra*, at 174; O'Reilly, *supra*, at 429. This change necessitated a modifica-

tion of the British "caution" given to suspects by law enforcement officials. Now, instead of informing detainees "[y]ou do not have to say anything unless you wish to do so, but what you say may be given in evidence," the standard caution reads: "You do not have to say anything. But it may harm your defence [sic] if you do not mention when questioned something which you later rely on in court. Anything you do say may be given in evidence." *Compare* Codes of Practice for the Detention, Treatment and Questioning of Persons by Police Officers, ¶ 10.4 (1985) (Eng.) [hereinafter "Codes of Practice"] *with* Codes of Practice, ¶ 10.4 (1995). Thus, Great Britain now joins the rank of common law countries like Scotland and India, which have both long allowed unfavorable comment and inferences to be drawn from an accused's silence. *See* Jeffery K. Walker, *A Comparative Discussion of the Privilege Against Self–Incrimination*, 14 N.Y.L. Sch. J. Int'l & Comp. L. 1, 15–19 (1993).

Similarly, in the countries that follow a civil inquisitorial system, the court regularly questions the defendant directly, and while no legal inference may be drawn from silence, the refusal of the accused to answer relevant questions is considered and may put a "negative gloss" on the other evidence or arguments offered by the defense. *Id.* at 23. For example, in Germany, a defendant's silence in the face of judicial inquiry may be commented on unfavorably by the judge and/or the prosecutor and may be considered an aggrava-

---

yer. Thirty years of experience with *Griffin* teaches us that it stands as perhaps the single most misguided decision of the Warren court in the area of criminal procedure. What has been lost is the opportunity to create a more civilized system of criminal investigation; one, moreover, that would permit an accurate determination of a suspect's guilt, innocence, or degree of culpability. Surely, the thoughtful supporters of the Warren court decisions in the area of criminal procedure must appreciate the irony that *Griffin* now stymies the very reforms of pretrial investigation that the Court sought.

**9.** The only restrictions placed on drawing an inference of guilt from a defendant's silence are that the defendant must be at least age 14, have no mental or physical condition making the testimony undesirable, the defendant's guilt must be in issue, and "the court must be satisfied at the conclusion of the evidence for the prosecution that the accused understands both that he may now give evidence and that adverse inferences may be drawn if he chooses not to do so." Ian Dennis, *The Criminal Justice and Public Order Act 1994: The Evidence Provisions*, [1995] Crim. L.Rev. 4, 17 (quoting The Criminal Justice and Public Order Act 1994, § 35(2) (Eng.)).

ting factor at sentencing, see id., while in the Netherlands, a defendant's silence is given great weight in the factual evaluation of a case and may also be commented on by judge and/or the prosecutor. See *id.* at 24. Likewise, in France, "[w]hile the accused technically has the right to remain silent, he or she rarely does. The substantive law allows the panel [of decision-makers] to consider 'what impression the means of defense have made upon their reason.' Since silence does not make a good impression in France, the accused very rarely declines to respond." Mary C. Daly, *Some Thoughts on the Differences in Criminal Trials in the Civil and Common Law Legal Systems*, 2 J. Inst. Stud. Legal Ethics 65, 71 (1999)(footnote omitted); *see also* Gordon Van Kessel, *European Perspectives on the Accused as a Source of Testimonial Evidence*, 100 W. Va. L.Rev. 799, 833 (1998) ("[I]n France, ... as a practical matter, defendant's complete silence will lead to adverse inferences by the judges such that the silence right is rarely invoked."). Thus, in many civil law countries, even if every statement made by an arrestee prior to learning of Article 36's right to consular notification were suppressed, defendants would, as a practical matter, actually benefit little from the remedy as they could still be questioned about their crime at later stages of the proceedings.

In sum, suppression of clearly relevant and sometimes, as in this case, dispositive evidence obtained in a constitutionally valid manner because of a violation of the Vienna Convention would be particularly damaging to the effective enforcement of our criminal laws. It is difficult to believe that the United States, aware that it has the broadest of exclusionary rules, would have agreed to such a remedy for a treaty violation where it would prejudice its criminal justice system more than that of any other country in the world and, moreover, to have agreed to do so without any discussion of the issue. Although the importance of respecting the Vienna Convention should not be minimized—both for the

benefit of foreign nationals here and for the sake of the reciprocal benefit afforded to Americans traveling abroad—remedying a treaty violation by so negatively impacting our criminal justice system is simply not a result to be presumed by the judiciary. Any such result, under our governmental structure, should require an explicit provision either in a treaty that has been duly signed by the Executive and ratified by the Senate or in a Congressional statute.

### Conclusion

For the reasons stated above, defendant Rodrigues' motion to suppress on the basis of a violation of Article 36, ¶ 1(b) of the Vienna Convention on Consular Relations is denied.

SO ORDERED.