UNITED STATES of America,
Plaintiff,

v.

Sergiy KURDYUKOV, et al., Defendants.

No. CRIM. H–99–371.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 8, 1999.

Erik Reed, Assistant U.S. Attorney, Houston, TX, for U.S.

Kenneth E. McCoy, Houston, TX, for Sergiy Kurdyukov.

Mark Bennett, Houston, TX, for Oleg Khmyznikov.

Lee Richardson, Jr., Houston, TX, Sergiy Kruglyak.

Marc C. Carter, Houston, TX, for Sergiy Lyubikovsky.

## Opinion on Jurisdiction

HUGHES, District Judge.

### 1. Introduction.

The M.V. *China Breeze*, a Panamanian ship bound for Portugal, was found in international waters south of the passage between Hispanola and Puerto Rico. With the permission of Panama's government, the United States Coast Guard searched the vessel and found four tons of cocaine. The coast guard ordered the ship to Galveston.

During the ten-day voyage, the crew were questioned by officers of the Coast Guard and Drug Enforcement Administration. Once in Galveston, the government charged members of the crew with conspiracy to possess and possession of a controlled substance on board a vessel subject to United States jurisdiction. *See* 46 App. U.S.C. § 1903. The defendants are nationals of the Ukraine, Greece, and Colombia.

The third mate, a Ukranian national, contests that the vessel was under the jurisdiction of the United States. He also says that if the laws of the United States apply to him, then he has the full protection of the Constitution. Finally, he wishes to suppress his statements to the government because its agents did not ad-

vise him of his right to speak to the Ukranian consul.

## 2. Jurisdiction.

■ The sailor does not contest the general authority of the United States on the high seas. He contests the government's adherence to the statute it chose to apply and the procedural consequences of its exercise of power at sea.

The government had the option of using force in the suppression of sea-borne trade harmful to American interests; the use of naval power and its complications is largely a political question rather than a judicial one. Instead, the government proceeded against the M.V. *China Breeze* and its crew under a statute requiring cooperation by the country of the ship's registry. Under the law, the United States may assert jurisdiction over a vessel registered to a foreign country "where the flag nation has consented or waived objection to the enforcement of United States law by the United States." 46 App. U.S.C. § 1903(c)(1)(C). Khmyznikov says that the consent that the government obtained from Panama was insufficient to vest the United States with jurisdiction over the ship.

Before it boarded the ship bearirfg Panama's flag, the coast guard learned from the Panamanian government that it had no objection to the United States intercepting and inspecting the ship.          .

> The government of Panana has verified registry and approved request to stop, board, and search. If evidence of illegal activity is discovered, detain vessel and crew on behalf of GOP and contact orig to coordinate disposition.

Cable, May 27, 1999, 20:55, from Commandant of the Coast Guard, Washington, D.C., to H.M.S. *Marlborough.*

The defendant argues that the failure to object to a search does not equal a consent to apply American law. The phrase in the cable "on behalf of" the government of Panama did not limit the impact of American authority over the ship. The best that can be made of the cable's text is that Panama and the United States had joint jurisdiction because the two countries were "to coordinate disposition."

Later Panama specifically authorized the coast guard to escort the vessel to a United States port for further inspection and to enforce United States law against it. Panama has declared that it does not object to the enforcement of the laws of the United States against the vessel or its passengers. *See* September 10, 1999, Declaration of Karl L. Schultz, Commander, United States Coast Guard.

> The government of Panama has specifically authorized escort to a suitable U.S. port and enforcement of U.S. law.... Interagency concurrence has been obtained to deliver vessel and crew to Houston, TX, for disposition.

Cable, May 28, 1999, 19:15, from Commandant of the Coast Guard, Washington, D.C., to H.M.S. *Marlborough,* USCGC *Vigilant,* and Department of Justice, Washington, D.C.

Like a foreign ship in port, the crew were subject to joint jurisdiction. *See The Marianna Flora,* 24 U.S. (11 Wheat.) 1, 57, 6 L.Ed. 405 (1825)(Story, J.)("We see no difficulty in supporting the jurisdiction as concurrent in both nations.") There are occasions when the distinction between consent and non-objection is important, but this is not one of them. Panama acquiesced in the direct and immediate control over the *China Breeze* by officers of the United States.

## 3. Constitutional Protection.

The defendant says that when the United States took jurisdiction over the ship, he became entitled to receive the protection of its Constitution; that is, if he is subject to the laws of the United States, then he is entitled to their benefits.

■ Khmyznikov is a Ukranian citizen, not a United States citizen; he was on the high seas, not in the United States. He did not enter this country until he landed in Galveston. En route he was under the watch of American officers, but not within

this country. The United States Constitution does not apply to aliens before they enter the country. Justice Jackson explained, "But even by the most magnanimous view, our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens." *Johnson v. Eisentrager,* 339 U.S. 763, 769, 70 S.Ct. 936, 94 L.Ed. 1255 (1950).

The exercise of jurisdiction by an American military commission in China—with China's consent—against German citizens who were charged with aiding Japan after Germany's surrender did not carry domestic Constitutional rights to the accused.

- The constitutional requirement that states act with regularity applies both to citizens and aliens *within* United States territory—protecting "an alien who has entered the country and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here." The Japanese Immigrant Case (*Yamataya v. Fisher*), 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903); U.S. CONST. amend. XIV, § 1.

- The right against unreasonable searches and seizures does not restrict governmental action against aliens abroad including on international waters. *See* U.S. CONST. amend. IV; *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 1061, 108 L.Ed.2d 222 (1990); *United States v. Davis,* 905 F.2d 245, 250–51 (9th Cir.1990).

- Similarly, the constitutional rights of the criminally accused do not apply to aliens outside of the United States. *See* U.S. CONST. amends. V. & VI; *Johnson v. Eisentrager,* 339 U.S. 763, 782–85, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (aliens imprisoned by United States army in Germany for military offenses in China had no standing to assert violations of the Constitution by writs of habeas corpus).

■ The practice of extra-constitutional seizure abroad is not contra-constitutional. *See generally United States v. Noriega,* 746 F.Supp. 1506 (S.D.Fla.1990), *aff'd,* 117 F.3d 1206 (11th Cir.1997), *reh'g denied en banc,* 128 F.3d 734 (11th Cir.1997)(en banc), *and cert. denied, Noriega v. United States,* 523 U.S. 1060, 118 S.Ct. 1389, 140 L.Ed.2d 648 (1998).

Although the government seized him for violating American laws, Khmyznikov only gets the benefits of its Constitution when he reaches its shores. From the record, it clearly appears that the defendant actually received the full benefits of American constitutional procedure. The court has heard and rejected his claim that (a) he was not advised of his rights and (b) he was not taken promptly before a magistrate. He was intelligibly warned that he could refuse to talk to the officers, what he did say could be used against him, and the lawyer information. The ten-day voyage to Galveston rather than a one-day voyage to San Juan was not a post-arrest detention without an appearance before a magistrate, at least, not in the context of a ship at sea with an administrative connection to a reasonably available port. He was not mistreated during the trip, and the trip was not to a port remote from lawyers, public, and consuls.

■ The search of the ship's spaces and papers was consistent with the constitutional requirements. He had no interest in the sewage holding tank or the engine log, as examples. *See United States v. Williams,* 589 F.2d 210, 214 (5th Cir.1979). Because possession even of a living space aboard ship is insecure—from reassignment or inspection by officers, for instance—a crew member's expectation of privacy is slight. *See O'Connor v. Ortega,* 480 U.S. 709, 717, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987)("The employee's expectation of privacy must be assessed in the context of the employment relation.").

*4. Vienna Convention.*

Khmyznikov also has moved to suppress statements because they were taken in violation of the Vienna Convention. *See* Vienna Convention on Consular Rights, Apr. 24, 1963, art. 36, 21 U.S.T. 77, T.I.A.S. No. 6820. The Vienna Convention requires governments arresting a foreign national to advise him of his right to consult with the consul of his country. As the government stipulates, when it arrested the sailor, it did not tell him of this right; however, before questioning him, the officers issued constitutional warnings in English and Russian. After indicating that he understood, the sailor talked to the investigators.

A. *Standing.*

■ International conventions vary whether they have direct effect—acting on individuals—or whether they announce an understanding among the nations themselves. "A treaty is primarily a compact between independent nations.... A treaty, then, is the law of the land as an act of congress is, whenever its provisions describe a rule by which the rights of the private citizen or subject may be determined." *Edye v. Robertson*, 112 U.S. 580, 594–95, 5 S.Ct. 247, 28 L.Ed. 798 (1884).

■ Although the Supreme Court has said that it *"arguably* confers on an individual the right to consular assistance following arrest," the convention has no implementing or enforcement mechanism. *Breard v. Greene*, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998)(per curiam) (emphasis added). Some courts have discussed and assumed standing, without deciding it. *See, e.g., United States v. Rodrigues*, 1999 WL 761171, *5 (E.D.N.Y.1999). Others have found standing. *See United States v. Lombera–Camorlinga*, 170 F.3d 1241, 1243 (9th Cir.1999)("where treaty provisions establish individual rights, these rights must be enforced by the courts of the United States at the behest of the individual.").

If the treaty is international *law,* it must be reciprocal; even if conventions on civil liberty are somehow pacts between nations and people, it is still instructive to look at the way individuals may enforce it in all the countries that adhere to it. In this case, the government of the Ukraine has favored the court with its protest through diplomatic channels to the government of the United States. While there may be parallel routes for individuals and nations, the communication of concern from one government to another indicates that a remedy may exist independent of the criminal proceeding itself. No one has submitted information to the court about individuals being able to enforce the treaty in the Ukraine within a criminal case.

The convention arose because of the common international practice of holding people incommunicado when they have been arrested. *See* Victor M. Uribe, *Consuls at Work: Universal Instruments of Human Rights and Consular Protection in the Context of Criminal Justice,* 19 Hous. J. Int'l L. 375 (1997). This defendant was not sequestered when he arrived near a consul; he was taken before an independent magistrate judge in a well-lighted, highly-public building crawling with representatives of a free press, where he was advised again of his rights under American law. The reason for the treaty notice does not apply so the treaty requirement should not apply.

Khmyznikov does not have standing to raise the Vienna Convention in his defense.

B. *Prejudice.*

■ If Khmyznikov had standing, he still would need to show that the failure to advise prejudiced him. Constitutional warnings on the right to remain silent and to have an attorney are stronger than the right to consular notification. *See United States v. Rodrigues,* 68 F.Supp.2d 178, 183–84 (E.D.N.Y.1999). Khmyznikov waived his constitutional rights, including his right to counsel; therefore, he cannot have been prejudiced by not being notified of a non-constitutional right.

What the consul would have told him cannot be known, but the consul has sworn that he would have told him not to talk without a lawyer's advice. Everyone agrees that, in general, that would likely be the best advice imaginable, at least at the start. While the American officers did not tell him to keep silent, they did tell him he had the right to keep silent.

Finally, Khmyznikov has not tried to show that he was unaware of the Ukranian consul in Houston or of his right to speak with him. The Ukranian community has assisted the sailors since their arrival in Houston, and they could have involved the consul, as they did in September. Also, seamen are routinely involved with their consuls in dealing with ships, crews, and cargo. Under American arrest standards, the accused does not need actually to be ignorant; we insist that the warning be given every time anyone is arrested as a procedural safeguard. Nothing connected with the Vienna Convention suggests that it is applied anywhere with the rigor of the American Constitution's application in America.

Khmyznikov experienced no prejudice as a result of the government's failure to notify him of his right to speak to his consul under the Vienna Convention.

### C. Remedy.

■ Assuming standing and prejudice, Khmyznikov says that the remedy for a Vienna Convention violation is to suppress his statements. No provision of the convention supplies that remedy. The convention does not even require government agents to stop speaking with a detainee after notifying him of his right to speak to his consul.

As an international agreement, the Vienna Convention's protection must be measured by international standards. The defendant seeks to suppress his statements, but suppression of evidence is not the generally accepted remedy for a rights violation. Although it is an effective, just remedy, it is uniquely an American solution. Had the governments of the Ukraine, Greece, Columbia, or Panama violated Khmyznikov's rights, the remedies there would not be suppression.

Theoretically, the defendant could bring a civil action for redress of the loss of his rights under the Vienna Convention, but under current American law, the government and its agents have more immunities than George III. It is open to question whether incorporating treaties into American tort law would do much for the cause of international order or individual liberty. *See Breard v. Greene*, 523 U.S. 371, 118 S.Ct. 1352, 1356, 140 L.Ed.2d 529 (1998)(Virginia immune from Paraguay's civil rights suit).

If he did have standing, his remedy would not be to suppress evidence. If he did, he could not use the treaty to suppress evidence he gave against himself when he was days' sailing from a consul to whom he could have talked. If he did, his invocation of the treaty would fail because he got better advice than the treaty specifies—he got American constitutional warnings.

### 5. Co-conspirators.

Some of Khmyznikov's ship mates have indicated that they would raise the same objections. The analysis of his claims applies to all sailors and passengers aboard the *China Breeze*.

### 6. Conclusion.

When Khmyznikov was approached by officers of the United States, the *China Breeze* was subject to the jurisdiction of the United States, and to the extent that the Constitution applied to him before he reached Galveston, he was accorded its protections. The government's failure to advise him that he could contact the Ukrainian consul is no basis to suppress his statements to the government because he got better warnings than the treaty requires and because he gave his statements long before he could have seen a consul. The government of the United States will address its failure to meet its

treaty obligation directly with the government of the Ukraine.

Current domestic and international law compel these conclusions in the context of ships at sea. While it applies the law to the facts, this opinion may not be read as approving any government's failure to afford basic procedural protection to people who are the object of official detention, accusation, and punishment. Warnings, grand juries, appointed counsel, and public trials may not be essential to practical, functional justice, but they are not a bad place to aim. In the world, the problem is not the absence of warnings; the trouble is the absence of rights.